IN THE UNITED STATES DISTRICT COURT
FOR NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: **SAFE DEPOSIT BOX # 586 LOCATED AT MEMBERS FIRST CREDIT UNION, 44 BRIDGE STREET, MANCHESTER, NEW HAMPSHIRE 03103** | Case No. ___21-mj-202-01-AJ___ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search safe deposit box # 586 located at Members First Credit Union, 44 Bridge Street, Manchester, New Hampshire 03103 in the name of Reda SHEHABELDIN , hereinafter "Box 586"for the items described in Attachment A.

2.      I am a Special Agent of the Bureau of Alcohol Tobacco Firearms and Explosives (hereinafter, "ATF") and have been so employed in this capacity since February of 2019.  I am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field Division.  While training to become a Special Agent, I attended the Federal Law Enforcement Training Center (hereinafter, "FLETC") in Glynco, GA full-time for six-and- a-half months. During my time at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was a Police

Officer for the Reading, Massachusetts Police Department for approximately seven years.

As a Special Agent and Police Officer I have conducted and/or participated in a number

of investigations involving state and federal firearm and controlled substance violations.

I have interviewed multiple victims, sources of information, witnesses, suspects, and

defendants regarding various types of criminal activity.  I have also served search

warrants for various crimes and have made criminal arrests for firearm and controlled

substance violations. I participated in state and federal investigations involving

possession of illegal weapons including firearms, improvised explosive devices and

possession of controlled substances.  I also conducted numerous investigative stops and

probable cause searches of people and vehicles.  I participated in physical surveillance

operations and participated in the execution of state and federal arrest warrants.

3.     During the course of my employment I have received specific training and

have obtained experience in investigations of Federal currency violations including

money laundering. By virtue of my experience and training I am familiar with money

laundering techniques utilized by individuals involved in illegal activities, such as

firearms and drug trafficking.  I know that it is common for drug traffickers to

accumulate large sums of U.S. Currency that are proceeds of their illegal conduct that

they seek to launder in order to avoid detection of their illegal activities, and attempt to

freely spend the cash without drawing law enforcement scrutiny.

4.     This affidavit is intended to show only that there is probable cause for the

requested warrant and does not set forth all of my knowledge about this matter. The

information set forth in this affidavit is based on my own participation in the

investigation, information I have received from other law enforcement officials and from

my and other agent's analysis of documents and records relating to this investigation.

5.      Based upon my training, experience, and the investigative efforts to date, I submit there is probable cause to believe that Reda SHEHABELDIN is involved in the distribution of controlled substances and money laundering activities associated with the distribution of controlled substances and that evidence and proceeds of these activities will be found in Box # 586.

## **RELEVANT STATUTES**

6.      Title 21, United States Code, Section 841(a)(1) reads in pertinent part,

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally…to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

7.      Title 18, United States Code, Section 1956(a)(1) reads in pertinent part,

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity…with the intent to promote the carrying on of specified unlawful activity…or knowing that the transaction is designed in whole or in part…to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity…shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

8.      Title 18, United States Code, Section 1957 reads in pertinent part,

> Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally

3

derived property of value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

## PROBABLE CAUSE

9.     Along with other members of law enforcement, I am conducting an investigation of Reda SHEHABELDIN into the illegal possession of firearms, illegal possession and distribution of drugs, and laundering the proceeds of his drug distribution.

10.     In conjunction with this investigation, I obtained a warrant to search the SHEHABELDIN's residence in Londonderry, New Hampshire (the "21-mj-15 warrant") to search (the "PREMISES") for evidence related to violations of 18 U.S.C. § 922(a)(6) (making a material false statement in connection with the acquisition of a firearm) and 18 U.S.C. § 922(g)(3) (the unlawful possession of firearms).  The 21-mj-15 warrant was issued on January 19, 2021, and executed on January 21, 2021.

11.     During execution of the 21-mj-15 warrant, and as further described below, law enforcement observed evidence of drug trafficking.  Law enforcement officers secured the scene and obtained an additional warrant to search SHEHABELDIN's residence (the "21-mj-20 warrant") for evidence related to violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).  The 21-mj-20 warrant was issued on January 22, 2021, and executed that same day.

12.     On November 14, 2020, SHEHABELDIN was arrested by the Manchester Police Department ("MPD") for resisting detention, disobeying a police officer and possession of a controlled drug. SHEHABELDIN had attempted to flee the scene a while operating a silver 2016 Nissan Altima, bearing New Hampshire registration 4309800, registered to SHEHABELDIN's father, Gamal Shehabeldin at PREMISES. MPD seized the following items from SHEHABELDIN's person: a tan Glock 19gen4 9mm pistol,

bearing serial number ACAY593 (hereinafter, the "tan Glock 19gen4"), containing a loaded magazine with fifteen (15) rounds of 9mm ammunition, $534.00 USD currency, approximately 8.8 grams of suspected marijuana, and two cellphones.

13.     SHEHABELDIN posted bailed on November 14, 2020 after his arrest and was released from the Manchester Police Department. A state arrest warrant was issued on November 24, 2020 for SHEHABELDIN for Reckless Conduct, which was executed on December 1, 2020. SHEHABELDIN was in custody at the Hillsborough County Department of Corrections from December 2, 2020 until December 9, 2020, when he posted bail and was released.

14.     On December 1, 2020, SHEHABELDIN was arrested by MPD for the aforementioned arrest warrant. While SHEHABELDIN was being transported to MPD, officers observed SHEHABELDIN trying to discard or destroy a small unspecified amount of suspected marijuana while in the back of the MPD Transportation Wagon. I know through my training, knowledge and experience that the amount located was consistent with personal use amounts.  MPD seized the 2020 silver Nissan Altima rental vehicle, bearing New Hampshire registration 4753198, registered to EAN Holdings LLC, which SHEHABELDIN was operating at the time of his arrest, pending a state search warrant. A state search warrant was obtained for the 2020 silver Nissan Altima and executed on December 9, 2020. The search warrant yielded a tan Glock 19X 9mm pistol, bearing serial number BHXC921 (hereinafter, the "tan Glock 19X")[1], a small unspecified

---

[1] A trace of the tan Glock 19X revealed that it was purchased from Merrimack Firearms LLC on 6/10/2019 by a resident of Atkinson, New Hampshire.  I am not aware of any information linking the initial purchaser of this firearm to DRS, and am not aware of how the firearm ultimately came into SHEHABELDIN's

amount of suspected marijuana, which I know through my training, knowledge and experience to be consistent with personal use amounts, and a cellphone. MPD obtained a state search warrant to extract the digital evidence and content contained within a cellphone seized from SHEHABELDIN's person and was executed on December 15, 2020 by MPD.

15.     On December 10, 2020, SHEHABELDIN plead guilty and was convicted of possession of a controlled drug in Manchester, New Hampshire District Court.

16.     I learned from speaking with members of the MPD Anticrime Unit and in review of MPD report #20-016275, I learned that on December 10, 2020 at approximately 9:10 PM, MPD officers checked on the whereabouts of SHEHABELDIN at the PREMISES, where he was ordered by the court to be between the hours of 9:00 PM and 7:00 AM, in compliance with his bail conditions. I learned that SHEHABELDIN violated his bail conditions at that time for not being at his home and arrived after his father and sister contacted him via telephone to come to the home.

17.     I reviewed a copy of an amendment to SHEHABELDIN's bail order that was granted by the Honorable Judge David Anderson of the Hillsborough County, New Hampshire Superior Court – Northern District on December 22, 2020. The amendment allowed SHEHABELDIN strictly to work at the FedEx, located at 44 Industrial Drive, Londonderry, New Hampshire between the hours of 12:30 AM until 9:30 AM from December 22, 2020 until January 2, 2021. According to supporting documentation to the

---

possession.  Based on my training and experience, individuals involved in drug trafficking often acquire firearms through private sales or in exchange for drugs.

amendment provided by SHEHABELDIN's lawyer, the temporary employment was as a seasonal package handler with a compensation rate of $15.75 USD per hour, which was payable weekly.

18.    I learned from speaking with members of the MPD Anticrime Unit and in review of MPD report #21-000247, I learned that on December 31, 2020 at approximately 10:22 PM, MPD officers checked on the whereabouts of SHEHABELDIN at the home, where he was ordered by the court to be between the hours of 9:00 PM and 7:00 AM, in compliance with his bail conditions. I learned that SHEHABELDIN's father and sister contacted him via telephone alert him of the police encounter, to which officers spoke to SHEHABELDIN from his father's cellphone. SHEHABELDIN stated he was working at FedEx at that time, as allowed through the amendment. According to the report, MPD officers were unable to locate SHEHABELDIN at the FedEx in Londonderry, New Hampshire. On January 4, 2021, MPD officers spoke with the Senior Manager of FedEx, who confirmed SHEHABELDIN had not worked on December 31, 2020, and thus violated his conditions of bail.

19.    I learned from speaking with members of the MPD Anticrime Unit and in review of MPD report #21-000257, I learned that on January 6, 2021 at approximately 20:07 PM, MPD conducted a motor vehicle stop on a gray 2014 Honda Accord, bearing New Hampshire registration 4816601, registered to Jessalyn Vargas, within the city limits of Manchester, New Hampshire for operating above the posted speed limit. The operator was identified as SHEHABELDIN, who stated he had just come from an appointment at a hospital. SHEHABELDIN was found to have $2,400.00 in USD currency on his person, however was unemployed since January 2, 2021. Given the

known wage SHEHABELDIN received, as well as the number of believed hours

SHEHABELDIN worked during his approximately ten-day span of employment,

according to the bail amendment, the money was inconsistent with the earnings of the

part-time FedEx position. SHEHABELDIN confirmed with MPD officers that he was no

longer employed by FedEx and was unemployed at that time. I confirmed through bank

records, obtained through the course of this investigation, of SHEHABELDIN's Digital

Federal Credit Union savings account ending in 8371, in which SHEHABELDIN

received three (3) paychecks from FedEx between December 2020 and January 2021 for

a total of $360.88.

*July 2020 Possession of a Firearm*

20.     I reviewed MPD Report #20-009118, dated July 20, 2020, in which MPD

conducted a motor vehicle stop of a 2013 black Dodge Dart, bearing New Hampshire

registration 4475414, registered to Jessalyn Vargas of Manchester, New Hampshire,

which was being operated by SHEHABELDIN. SHEHABELDIN claimed Jessalyn

Vargas was his step-sister. As a result of the stop, which was recorded on MPD body

cameras, SHEHABELDIN consented and produced a container of Boutiq Kush Mint

Hyrid THC edibles. SHEHABELDIN admitted to officers, that the mints were "like

marijuana", which I knew through my training and experience to mean to contain THC

and defined as an illegal controlled substance under Federal law. MPD officers opened

the container and observed it to contain marijuana and that the container did not contain

THC edibles. SHEHABELDIN admitted to regularly consuming marijuana. During the

interaction, SHEHABELDIN was found to have a Smith & Wesson M&P .40 caliber

pistol, bearing serial number HPL5097,[2] with a loaded magazine containing nine (9) rounds of 9mm controlled-expansion tipped ammunition, commonly referred to as "hollow-points". The firearm was seized as contraband based upon SHEHABELDIN's statements of being a drug user.

*NIBIN Lead*

21.     On November 20, 2020, I reviewed the National Integrated Ballistic Information Network (hereinafter, "NIBIN") Lead for Crime Gun #762-20-000756 for a 9mm luger shell casing (MPD Evidence Item #KK-7, per MPD Case #20-013934) which was recovered on October 24, 2020 at 3 Kitchens Bar and Grill, located at 333 Valley Street, Manchester, NH, after a shooting incident occurred where numerous shell casings of different calibers were recovered. The NIBIN Lead matched the aforementioned 9mm shell casing to the test fired 9mm shell casing (MPD Evidence Item #JMM01, per MPD Case #20-015013) from the tan Glock 19gen4, seized from SHEHABELDIN on November 14, 2020.

22.     Based on my training, experience, and interaction with firearms examiners, a NIBIN Lead is an unconfirmed (presumptive) potential association between two or more pieces of firearm ballistic evidence based on a correlation review of digital images in the NIBIN database. These potential associations are identified by either a firearms examiner or a trained NIBIN technician. There is a high probability that a microscopic comparison, by a firearms examiner, will confirm the association between

---

[2] The Smith & Wesson pistol was traced to James L McLoud & Sons Manchester Firing Line Range, a Federal Firearms Licensee who is no longer in business.  Additional information on the firearm was not found within available records.

the firearm ballistic evidence.

23.     On November 20, 2020, trained personnel from the ATF Boston Field Division Crime Gun Intelligence Center ("CGIC") identified a NIBIN Lead/Leads between the following 9mm cartridge cases:

    a.   MPD Case #20-013934, Evidence Item KK-7; and

    b.   MPD Case #20-015013, Evidence Item JMM01.

In layman terms, there is a high probability that the tan Glock 19gen4, seized from SHEHABELDIN on November 14, 2020, was the firearm used in the October 24, 2020 shooting at 3 Kitchens Bar and Grill.

24.     I reviewed ATF eTrace #T20200449949 for the tan Glock 19gen4 and learned that the firearm was purchased by SHEHABELDIN on December 3, 2018 from Shooters Outpost, a federal firearms licensee, located at 1158 Hooksett Road, Hooksett, New Hampshire.

*Posts Related to Drug Distribution on the @drs_ghost Instagram Account*

25.     I reviewed the public postings of the Instagram account of SHEHABELDIN, under the username "@drs_ghost". I know through conversations with the MPD Gang Unit that SHEHABELDIN's nickname or street moniker is "Ghost".  I am also familiar with and was able to identify SHEHABELDIN in photographs and videos after viewing approximately hundreds of photographs and/or videos of "@drs_ghost" and other social media accounts, DMV records, DMV license photographs and booking photographs from prior arrests.  From this, I conclude that SHEHABELDIN is the user of the "@drs_ghost" account.

26.     The @drs_ghost" account contains images of marijuana that are indicative

of drug distribution.  For example, on November 30, 2020, the account posted images of large quantities of marijuana with text that read "Zaza hit me deliveries extra 5 of what u purchase get up wit me" and another image with 150 ounces hmuuuu 550 qp.  Based on my training and experience, "qp" refers to a quarter of a pound.  The quantity and text of this image are indicative of distribution.



27.     Similarly, on December 1, 2020, the account posted additional images of marijuana with test indicative of drug distribution:



_Execution of the 21-mj-15 and 21-mj-20 Warrants_

28.     At approximately 9:00 PM on January 21, 2021, law enforcement officers executed the 21-mj-15 warrant.  Later that evening, I obtained and executed the 20-mj-20 warrant.

29.     Occupants of home identified one bedroom in the home as SHEHABELDIN's.  In that room, law enforcement officers found in the pocket of a jacket hanging on the closet door: 24 oxycodone hydrochloride round pills with different imprints on them[3]; seven vials labeled "dank woods top shelf blue dream sativa, ¼ gram hash, 2 grams flower," and contained within each vial was what appeared to be a rolled blunt; and $10,000 in cash in a jacket pocket.  The pills were in a tied-off plastic baggie.  The baggie contained powder residue in addition to the pills and the baggie appeared to have been opened and tied multiple times.  In addition in that room, law enforcement officers found $1,503 in cash in a pillow case on the bed, and indicia of gang membership in DRS, including a photograph of SHEHABELDIN with a deceased DRS member, bail slips for other known DRS gang members posted by SHEHABELDIN, hand-written notes that include names and numbers of known DRS gang members.  Law enforcement officers found a cellphone in this bedroom in the pillow case with $1,503.

30.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office and on scene during the execution of the warrants, these items stored collectively are indicative of the

---

[3] Another law enforcement officer, Manchester Officer Eric Joyal explained that the pills have several different imprints on them.  For example, one is a round blue pill with "U24" on one side and a score mark on the other side,  another is a round yellow pill with "T/189" on one side with a score mark on the side of the imprint, and no marking on the other side, and another is a round blue pill with "ALG/265" on one side and a score mark on the other side.  According to drugs.com, each of these markings indicate that the pills are 30 milligrams of oxycodone hydrochloride, a Schedule II controlled substance.

distribution of marijuana products and oxycodone hydrochloride.  In particular, the fact

that the oxycodone hydrochloride pills contained different markings indicates that it is

unlikely that these were prescribed, as when an individual receives a prescription,

typically all of the pills contain the same markings.  In addition, though the number of

pills in isolation could be indicative of personal use, when stored with other drugs and a

substantial quantity of cash, it indicates that the drugs were possessed for distribution

rather than personal use.  Moreover, SHEHABELDIN has no legitimate source of

employment at this time, and law enforcement officers did not find any documents

evidencing a valid prescription for oxycodone hydrochloride.

31.     Based upon my training and experience, as well as the collective

knowledge and experience of other agents and police officers in my office and on scene

during the execution of the warrants, "dank woods top shelf blue dream sativa, ¼ gram

hash, 2 grams flower," is a cannabis derivative containing THC.

*Information from the Extraction of SHEHABELDIN's Devices*

32.     Pursuant to a federal warrant, I submitted the cellphones and other devices

seized during execution of the 21-mj-15 and 21-mj-20 warrants to be examined by the.

New England Regional Computer Forensics Laboratory in Chelsea, Massachusetts.  At

this time, I have received only a partial extraction of SHEHABELDIN's cellphones.

33.     As set forth in more detail below, and based on my review of the

extraction reports, I believe that SHEHABELDIN, at the instruction of his older brother,

Ammar SHEHABELDIN, (hereinafter "AMMAR"), would gather quantities of money

and provide it to unidentified individuals at particular locations in and around the

Manchester area. I know from my training and experience that individuals involved in illegal activity, including drug trafficking, often speak in code to conceal their intent from law enforcement.

34.      For example, I observed a text conversation between SHEHABELDIN and the phone number 978-631-5324, dated November 23, 2020.  Based on the contents of the communication, I was able to determine that the individual using the -5324 number was AMMAR.   The conversation went as follows:

| | |
|---|---|
| AMMAR: | "هاتلنا الاكل من المكان دهوه وانته راجع" [Google Translation: "bring us food from this place and you are back"] with an attached photo of XOS Manchester, located at 827 Elm Street, Manchester, NH. |
| SHEHABELDIN: | "Okay and I'm here" |
| AMMAR: | "Ok" |
| AMMAR: | "He is facing good will" |
| SHEHABELDIN: | "What car ?" |
| AMMAR: | "شوفته" [Google Translation: "I saw it"] |
| SHEHABELDIN: | "Yeah" |
| SHEHABELDIN: | "What's name ?" |
| AMMAR: | "John" |

35.      I know, from my training and experience, that the term "food" is a common code word for drugs, typically as a reference to cocaine and/or methamphetamine.  Based on my review of the extractions, there is no indication that SHEHABELDIN is employed as any type of food delivery service, such as "UberEats," "Grubhub," or "DoorDash."  Based on my involvement in this investigation and my review of the extractions, I believe that in this conversation AMMAR was using the term "food" to refer to drugs.

36.      I observed a text conversation between SHEHABELDIN and AMMAR

using the same phone number 978-631-5324, dated January 1, 2021. The conversation

went as follows:

| | |
|---|---|
| AMMAR: | "Wanna take 5 from dad and go bring to Adam at 2 clock in whole food in Bedford" |
| AMMAR: | "He is on my back a lil for his money" |
| SHEHABELDIN: | "Yeah" |
| AMMAR: | "Ok" |
| AMMAR: | "خود الف من ابوك خود اصحابك واخرجوهم اتغدي كويس في ماس وتعالي قبل الساعه ٩" [Google Translate: "Take a thousand from your father, take your friends and take them out, have a good lunch in Mas [Massachusetts] and come before 9 o'clock"] |
| AMMAR: | "الهدوم عندك في دولاب امك" [Google Translate: "The clothes you have in your mom's closet"] |
| AMMAR: | "ماتروحش مانشستر خالص عشان انت كنت هناك في عيد ميلاد بنت الواد ده الاسبوع اللي فات واني ما اتكلمتش" [Google Translate: "Don't miss Manchester at all, because you were there for Valley Girl's birthday this week, last week, and I can't talk to you"] |
| AMMAR: | "Don't forget 2 clock" |
| SHEHABELDIN: | "I'm on way there rn [right now] 5 min away" |
| AMMAR: | "He is going to in his Range Rover" |
| SHEHABELDIN: | "What color ?" |
| AMMAR: | "Like green ish" |
| SHEHABELDIN: | "Okay" |

37.     Based on my training and experience, I believe that this was a coded

conversation relating to the transfer money.  Based on my training and experience, I

know that individuals use short-hand numbers to refer to large sums of cash.  In this

conversation, for example, "5" would refer to $5,000.00. This is corroborated by the later

statement in the conversation that "He is on my back for a lil for his money."  Based on

my training and experience, review of the extraction reports, and involvement in this

case, I believe that AMMAR was directing SHEHABELDIN to take $5,000.00 to a

person named "Adam" and to meet in the parking lot of Whole Foods in Bedford, NH. In

light of SHEHABELDIN's lack of employment and involvement in drug distribution, and

based on my training and experience, I believe that this money was proceeds of drug

15

distribution and is consistent with paying money to a source of supply who "fronted" guns or drugs.[4]

38.     I observed a text conversation between SHEHABELDIN and AMMAR using the same phone number 978-631-5324, dated January 16, 2021. The conversation went as follows:

> AMMAR:        "Wya" [where you at]
> SHEHABELDIN: "Home"
> AMMAR:        "Get 15 ready I'll have you see you this nigga down the street or something in a lil"
> SHEHABELDIN: "Okay"
> AMMAR:        "He'll be at the shells in like 20"
> AMMAR:        "978-837-9390"
> AMMAR:        "كلمه شوفه فين كده" [Google Translation: "Where do you see a word like this?"]
> SHEHABELDIN: "Okay calling rn [right now]"

39.     Based on my training and experience, I believe that this was a coded conversation relating to the transfer money.  Based on my training and experience, I know that individuals use short-hand numbers to refer to large sums of cash.  In this conversation, for example, "15" would refer to $15,000.00. Based on my training and experience, review of the extraction reports, and involvement in this case, I believe that AMMAR was directing SHEHABELDIN to take $15,000.00 to an unnamed individualand to meet at Shell Gas Station, located at 162 Rockingham Road, Londonderry, directly off of Interstate Route 93 Exit 5.  I know that individuals involved

---

[4] I know from my involvement in this investigation, including from reviewing social media posts including photographs of SHEHABELDIN, that he has possessed a variety of firearms.  Based on my training and experience, and involvement in this investigation, SHEHABELDIN has purchased some firearms from Federal Firearms Licensees ("FFLs") and has possessed other firearms purchased by other individuals from FFLs.  Based on my training and experience, I know that individuals involved in drug trafficking often acquire firearms through private sales or in exchange for drugs.

in drug and firearms trafficking often meet in readily accessible locations near interstate highways, such as gas stations, to meet with business associates to later conduct illegal activities.

40.     I learned through a search of the phone number 978-837-9390 that it belonged to Felix ESPINAL. I learned through ESPINAL's criminal history that he currently had an open case from an arraignment in Dudley, Massachusetts District Court on October 25, 2018 for Possession with Intent to Distribute a Class B Controlled Substance. I know that opiate derivatives, such as Oxycodone Hydrochloride, similar to that located in SHEHABELDIN's bedroom on January 21, 2021, is a Class B substance. I also know that cocaine, often referred to as "food", such as by AMMAR on November 23, 2020, is a Class B substance. In light of SHEHABELDIN's lack of employment and involvement in drug distribution, and based on my training and experience, I believe that this money was proceeds of drug distribution and is consistent with paying money to a source of supply for drugs.

41.     Based on my review of the extractions, I observed SHEHABELDIN frequently took photographs of large quantities of money, which were saved to his cellphone.

42.     For example, I observed the following images dated December 30, 2020:[5]

---

[5] Through the extraction report, I observed some of the photographs to be dated December 30, 2020. I know through the review of hundreds of photographs containing SHEHABELDIN, including physical observation, the review of booking photos, social media accounts and speaking in person, that SHEHABELDIN has had longer hair and facial hair throughout the months of December 2020 and January 2021. Therefore, I believe the timestamps on the photographs as listed in the extraction report as December 30, 2020 are perhaps the dates the photographs were screenshot or transferred from a separate electronic device. The true dates of the above photographs appear to be unknown. However, some of the photographs in the extraction report had timestamps that through my training, knowledge and experience appeared consistent with metadata derived from taking a photograph, such as a timestamp, GPS location, and device information.



43.    I observed the following image taken by and saved on SHEHABELDIN's phone dated January 19, 2021:



44.    I observed the following photographs dated January 21, 2021, taken by and saved to SHEHABELDIN's phone. I know that the text added to the photographs are indicative to being edited and posted to SnapChat.

18



45.     I know that the photograph with the caption "Feeling Some Type of Way" was posted to Snapchat on or about January 21, 2021 at approximately 8:08 PM. I know that the background of the photograph consisted of the purple bed sheet located on SHEHABELDIN's bed and that the two banded stacks of cash seized during the federal search warrant had the same elastic bands used to secure the cash, amounting to $10,000.00.

46.     On or about January 21, 2021 a photograph of a unknown quantity of marijuana was photographed and saved to SHEHABELDIN's cellphone. I observed the caption read "Orders going out at 5 tap in now". I know through my training, knowledge and experience that to tap in is in reference to being direct messages via social media platforms such as Snapchat. I know that the caption is similar to that available from the social media app Snapchat and can only be used on a smartphone cellphone. I know that "orders" are indicative of ordering a quantity of drugs to be received.



47.     I also observed a photograph dated December 30, 2020, depicting a large quantity of money, a digital scale and what appeared to be a glassine bag were on SHEHABELDIN's cellphone. I know through my training, knowledge and experience that digital scales and glassine bags are used for packaging drugs for distribution. I know that profits obtained through the sale and distribution of drugs are often utilized to bolster reputation and credibility.



48.     I learned through the cellphone extraction report, obtained through a federal search warrant, that SHEHABELDIN communicated via his Snapchat account of

"Montana-603", with the individual using the account "wplug64" and username

"⬤W🖋 Plug 🗝⬤". SHEHABELDIN and "wplug64" began their conversation on

September 8, 2019 through the present. I learned through reviewing the conversation that

SHEHABELDIN inquired "wplug64" in code for what was later determined through

conversation to be marijuana and/or THC-derivative products. "wplug64" stated they

were based in San Francisco, California and gave details of the shipping operation to

include "Stuff is professionally wrapped into an oily plastic, no smell,no x-ray

penetration and can not be dictated even with the ION scanner. then packaged into a

PlayStation or X-box carton so buyer receives stuff as though receiving a newly ordered

game. I also send customized packages ( diplomatic sealed ) which evade all custom

checks." I recognized the description to be how to conceal and ship contraband, later

determined through conversation to be marijuana. SHEHABELDIN and "wplug64"

continued to communicate and I observed "wplug64" provide advice to SHEHABELDIN

on starting his own operation in New Hampshire. On or about December 17, 2020,

SHEHABELDIN provided a fake address of 33 Agnes Street, #310, Manchester and the

email Sjosh2037@gmail.com.

*Records Relating to Box 586*

49.    Over the period of September 25, 2019 through the present

SHEHABELDIN has maintained a banking relationship with Members First Credit

Union located at 44 Bridge Street, Manchester, New Hampshire.  This relationship

consisted of two savings accounts and Box 586.  Bank records relating to the accounts

and Box 586 maintained in the name of Reda SHEHABELDIN at Members First Credit

Union were obtained pursuant to this investigation. I know the accounts were opened by

SHEHABELDIN due to bank records that show photocopies of his social security card and New Hampshire Driver's License, as well as associated forms with personally identifying information. When opening the accounts, SHEHABELDIN represented to Members First Credit Union that he was unemployed.

50.     An analysis of the SHEHABELDIN's accounts reveal there have been no deposits into his accounts indicative of routine employment.

51.     Based on my review of bank records and bank statements, SHEHABELDIN opened an account ending in 1070 and rented Box 586 on September 25, 2019. Bank records show that SHEHABELDIN deposited $65.00 on that date, and that $60.00 was withdrawn to pay for the annual safe deposit box rental fee as outlined on the rental agreement. SHEHABELDIN never made another deposit or withdrawal to the account ending in 1070.

52.     The records showed that on August 11, 2020, Members First Credit Union closed the savings account due to dormancy fees and a zero balance. Bank records show the following recorded entries into Box 586 while it was rented under account ending in 1070:

Box #586 – Account ending in 1070

| Date | Time Entered | Time Exited |
|------|-------------|-------------|
| 09/25/2019 | 3:11 PM | Unrecorded |
| 10/05/2019 | 11:26 AM | 11:30 AM |
| 10/08/2019 | 3:45 PM | 3:50 PM |
| 10/11/2019 | 2:40 PM | 2:43 PM |
| 10/16/2019 | 3:45 PM | 3:50 PM |
| 10/21/2019 | 4:35 PM | 4:40 PM |
| 10/28/2019 | 4:10 PM | 4:20 PM |
| 11/04/2019 | 3:04 PM | 3:10 PM |
| 11/08/2019 | 3:12 PM | 3:25 PM |
| 11/12/2019 | 3:30 PM | 3:35 PM |
| 12/06/2019 | 4:35 PM | 4:40 PM |
| 12/23/2019 | 10:20 AM | 10:23 AM |

| 01/27/2020 | 2:45 PM | 2:51 PM |
| 03/13/2020 | 11:35 AM | 11:45 AM |
| 05/12/2020 | 3:00 PM | Unrecorded |
| 10/02/2020 | 11:00 AM | 11:10 AM |

53.     Based on my training and experience, and involvement in this investigation, someone accessing a safe deposit box must provide personal identification, bank membership identifying information, and keys to the safe deposit box.  Therefore, I believe SHEHABELDIN made the entries into Box 586 because, according to the bank records, SHEHABELDIN was the sole individual listed on the account.

54.     Although the account ending in 1070 was closed on August 11, 2020, an individual still accessed Box 586 using the account ending in 1070.

55.     Based on my review of bank records, I learned that after SHEHABELDIN's account was closed on August 11, 2020 due to dormancy, SHEHABELDIN reopened a new savings account ending in 4964 on August 24, 2020. When SHEHABELDIN applied to the account he answer "No" to the question "Do you regularly receive funds from any source(s) other than your named employer?".

56.     Based on those bank records, I learned that on August 26, 2020, SHEHABELDIN rented safe Box 586 for $60.00. SHEHABELDIN deposited $65.00 into the account ending in 4964 and withdrew $60.00 on the same day, the amount of the rental fee for a safe deposit box as described in the signed annual rental agreement . SHEHABELDIN never made another deposit or withdrawal to the savings account.

57.     Bank records show the following recorded entries into Box 586 while it was rented under account ending in 4964:

Box 586 – Account ending in 4964

| Date | Time Entered | Time Exited |
|------|------|------|
| 08/24/2020 | 2:00 PM | 2:18 PM |
| 08/09/2020* | 12:09 PM | 12:20 PM |
| 09/14/2020 | 1:55 PM | 2:00 PM |
| 09/25/2020 | 10:25 AM | 10:30 AM |
| Unrecorded | 9:35 AM | 9:40 AM |
| Unrecorded | 11:30 AM | 11:35 AM |

58.     Members First Credit Union could not clarify whether the second entry
was a typographical error or backdating the access to Box 586.

59.     Based on my review of bank records, I learned that on or about April 17,
2018 Reda SHEHABELDIN opened a checking and savings account ending in 8371 at
Digital Federal Credit Union. I observed SHEHABELDIN provided his social security
card and his New Hampshire Driver's License information was recorded, as well as
additional personal identifying information. During the period April 17, 2018 through
April 30, 2021, forty-eight (48) cash deposits for a total of $61,548.07 and thirty-six (36)
cash withdrawals for $48,739.00 were made into the account ending in 8371.

60.     Bank records also showed the following deposits made into the account
ending in -8371: fifteen (15) payments in the month of May 2020 from the Massachusetts
Department of Unemployment, despite being a resident of New Hampshire, for a total of
$8,205.00. I learned from Mass.gov website that in order to collect Massachusetts
Unemployment Benefits, one must have been employed by a business in the
Commonwealth of Massachusetts. Based upon the identified bank accounts in
SHEHABELDIN's name, there were no indications of legitimate sources of income from
Massachusetts-based companies. Based on this, I believe SHEHABELDIN filed a false
claim to receive Massachusetts Unemployment Benefits during the COVID-19 Pandemic

due to the easily obtained funding and lack of scrutiny and oversight. I know through my knowledge, training and experience as well as speaking with other members of law enforcement who investigate benefits fraud, Massachusetts Unemployment Benefits were heavily targeted by individuals attempting to obtain funds through false representation, such as out-of-state residences with no prior Massachusetts-based employment.

61.     Bank records show the following cash deposits into the account ending in 8371 on the following same days records show entries to Box 586:

| Date | Amount |
| --- | --- |
| 10/16/2019 | $2,000.00 |
| 10/21/2019 | $2,000.00 |
| 11/04/2019 | $2,705.00 |
| 11/04/2019 | $1,600.00 |

62.     During the aforementioned time period, SHEHABELDIN's only known employment, obtained through court documents, bank records, and police reports and recordswas from two employers:

    a.    Seafood Kingdom, in Hampton, New Hampshire, from June to August 2020, in which SHEHABELDIN received ten (10) paychecks for a total of $2,014.04.

    b.    FedEx in Londonderry, New Hampshire, from December 2020 to January 2021, in which SHEHABELDIN received three (3) paychecks for a total of $360.88.

63.     I observed through bank records that SHEHABELDIN received the following additional unexplained deposits into the account ending in 8371 of (1) $16,656.93 through one-hundred four (104) Square/Cash App deposits, and (2) seven deposits for a total of $5,812.00 from unknown sources. The total unexplained cash

deposits and electronic transfers to his known bank accounts, checking and savings, totals $92,222.00 during this same time period.

**TRAINING AND EXPERIENCE CONCERING ITEMS TO BE SEIZED**

65.     I know through my training and experience that it is a generally common practice for drug traffickers to conceal large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances both at their residences and other places they access frequently, including safe deposit boxes. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. I know that it is common practice for drug traffickers to conceal such readily transported assets both at their residence and other places they access frequently, including safe deposit boxes.

66.     Also based on my training and experience and this investigation, I know that people keep their valuables in places they deem secure. This is particularly true where the items are proceeds of, instrumentalities of, or evidence of crimes – items they wish to conceal from discovery.  A safe deposit box is a place that people often deem secure as it is a place which they can control access to.

67.     I also know that drug traffickers do not always keep their entire supply them at all times and often have numerous locations to keep drug supply, money and firearms to protect the latter. I know that drug traffickers protect their supplies, illegally obtained profits and firearms concealed from law enforcement through the use of multiple locations and hiding places.

68.     I know that bank deposit boxes are often used to store highly prized items and banks frequently provide a higher level of security and customer service for the specialize service.  Based on my training and experience, individuals who obtain and use safe deposit boxes for lawful purposes typically visit the safe deposit box infrequently. Based on my review of bank records and involvement in this investigation, and on my training and experience, I believe the frequent access to the safe deposit box, coupled with significant unexplained deposits into the associated accounts, indicates that Box 584 is being utilized to store proceeds of drug distribution, monies to be used to purchase controlled substances, assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels, and evidence of and proceeds of money laundering.

69.     Moreover, due to the fact that SHEHABELDIN lives at home with his parents and younger siblings, his involvement with drug distribution, and the frequency with which he accesses Box 586, I believe that SHEHABELDIN uses Box 586 as an alternative location to conceal proceeds from drug sales or monies to be used to purchase controlled substances, as well as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels purchased with proceeds of drug trafficking.

## **CONCLUSION**

70.     I submit that this affidavit supports probable cause for a warrant to search

Box 586 to seize the items described in Attachment A.

Respectfully submitted

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Honorable Andrea K. Johnstone
United States Magistrate Judge
 **Jul 29, 2021**

28

**ATTACHMENT A**

**ITEMS TO BE SEIZED**

      1.      Currency, including United States currency, or readily transported assets that are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, jewelry), prepaid debit cards and gift cards;

      2.      Controlled substances including but not limited to marijuana and oxycodone hydrochloride;

      3.      Firearms and ammunition; and

      4.      Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;